J-A02011-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.B., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 886 WDA 2021 |

Appeal from the Order Entered July 7, 2021
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s): CP-05-DP-0000016-2021

BEFORE: OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:                **FILED: FEBRUARY 14, 2022**

Appellant, T.H. ("Mother"),[1] appeals from the July 7, 2021 order that found aggravated circumstances existed as to Mother and B.G. ("Father")[2] and ordered that no efforts be made by the Bedford County Children and Youth Services ("BCCYS") to preserve the family and reunify B.B. with Mother.[3] We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] T.H. is the biological mother of B.B., a minor child born March 2021.

[2] B.G. is the biological father of B.B. Father did not appeal the July 7, 2021 order and is not a party to this appeal.

[3] An order finding aggravated circumstances is a collateral order, **see** Pa.R.A.P. 313(b), and is immediately appealable as of right pursuant to Pa.R.A.P. 313(a). **See In re R.C.**, 945 A.2d 182, 184 (Pa. Super. 2008) (stating that, an appeal of an order finding the existence of aggravated circumstances is, "by definition[,] an appeal as of right from a collateral

The trial court summarized the procedural history as follows:

[BCCYS] took custody of B.B. upon discharge from the hospital following his birth. [] Prior to [B.B.'s] birth[,] both parents [] had extensive involvement with [BCCYS]. With regard to [Mother], she has an extensive history with mental health issues and instability in housing, which resulted in involuntary termination of her parental rights to two prior children. [Mother's] parental rights to [one of her children] were involuntarily terminated by order dated February 9, 2018. On May 8, 2019, the [trial] court found aggravating circumstances existed with regard to [another of her children] and did not order reunification efforts. [Mother's] parental rights to [this second child] were involuntarily terminated by order dated June 13, 2019. Father similarly has a history of involvement with Indiana County Children and Youth Services due to instability and inability to care for [his] other children, resulting in involuntary termination of his parental rights to [one of his children] on May 30, 2019.

[B.B.] was adjudicated dependent on July [7], 2021, pursuant to 42 Pa.C.S.A. § 6302(1) and (10). [The trial] court further found that sufficient evidence was presented to enter a finding of aggravating circumstances, pursuant to 42 Pa.C.S.A. § 6341(c.1)[,] and [] ordered that no efforts are to be made to preserve the family and reunify the child with [Mother] and Father.

Trial Court Opinion, 8/26/21, at 1-2. This appeal followed.[4]

_____

[o]rder"); *see also* *In the Interest of: A.D.-G.*, 263 A.3d 21, *26 n.4 (Pa. Super. 2021) (slip copy), *appeal denied*, 2021 WL 5104285 (slip copy); Pa.R.A.P. 313(b) (defining a collateral order as "an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost"); Pa.R.A.P. 313(a) (stating that, "[a]n appeal may be taken as of right from a collateral order of a trial court").

[4] Mother filed a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i), with her notice of appeal on August 2, 2021. The trial court filed its Rule 1925(a) opinion on August 26, 2021.

Mother raises the following issue for our review:

Whether the [trial] court erred [or] abused its discretion by failing to order [BCCYS] to make efforts to reunify the child with Mother [] as the record indicates visitation went well and reunification was warranted?

Mother's Brief at 4.[5]

Mother's issue challenges the aggravated circumstances order issued as part of the trial court's dependency hearing and, specifically, the portion of the order directing BCCYS to make no further efforts to preserve the family and reunify B.B. with Mother. Our standard and scope of review of such dependency orders are as follows:

The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law. *In re R.J.T.*, [] 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion. [*In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015).]

In dependency proceedings our scope of review is broad. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the [trial] court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. [*In re C.B.*, 861 A.2d 287, 294 (Pa. Super. 2004), *appeal denied*, 871 A.2d 187 (Pa. 2005).]

_____

[5] Mother extends her claim to include Father, asserting that, "the trial court erred [or] abused its discretion by failing to order [BCCYS] to make efforts to reunify the child with Mother **and Father**." Mother's Brief at 5 (emphasis added). As stated *supra*, Father has not filed an appeal of the July 7, 2021 order. Therefore, we do not consider Mother's issue as it applies to Father.

*In Interest of J.M.*, 166 A.3d 408, 416 (Pa. Super. 2017) (quotation marks omitted, formatting modified).

The Pennsylvania Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375, which governs dependency proceedings, provides that the trial court may adjudicate a child dependent if the trial court finds, by clear and convincing evidence, that the child meets the requirements of one or more of the ten criteria enumerated at 42 Pa.C.S.A. § 6302.[6]  *See* 42 Pa.C.S.A. § 6341(a) (stating that, "[a]fter hearing the evidence on the petition the [trial] court shall make and file its findings as to whether the child is a dependent child"); *see also* 42 Pa.C.S.A. § 6341(c) (stating that, a finding of dependency must be supported by clear and convincing evidence).  Once the trial court finds a child dependent, upon petition by the county agency, the trial court may find that aggravated circumstances exist by clear and convincing evidence.[7]  *See* 42

---

[6] "Clear and convincing evidence" is defined as evidence that is "so clear, direct, weighty[,] and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation and original quotation marks omitted).

[7] The Juvenile Act defines "aggravated circumstances" as any of the following circumstances:

(1) The child is in the custody of a county agency and either:

(i) the identity or whereabouts of the parents is unknown and cannot be ascertained and the parent does not claim the child within three months of the date the child was taken into custody; or

Pa.C.S.A. § 6341(c.1). If the trial court determines that aggravated circumstances exist, the trial court must determine "whether or not

_____

> (ii) the identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months.
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence[,] or aggravated physical neglect by the parent.
>
> (3) The parent of the child has been convicted of any of the following offenses where the victim was a child:
>
>> (i) criminal homicide under 18 Pa.C.S.[A.] Ch. 25 (relating to criminal homicide);
>>
>> (ii) a felony under 18 Pa.C.S.[A.] § 2702 (relating to aggravated assault), 3121 (relating to rape), 3122.1 (relating to statutory sexual assault), 3123 (relating to involuntary deviate sexual intercourse), 3124.1 (relating to sexual assault)[,] or 3125 (relating to aggravated indecent assault).
>>
>> (iii) A misdemeanor under 18 Pa.C.S.[A.] § 3126 (relating to indecent assault).
>>
>> (iv) An equivalent crime in another jurisdiction.
>
> (4) The attempt, solicitation[,] or conspiracy to commit any of the offenses set forth in paragraph (3).
>
> (5) The parental rights of the parent have been involuntarily terminated with respect to a child of the parent.
>
> (6) The parent of the child is required to register as a sexual offender under Subchapter H of Chapter 97 (relating to registration of sexual offenders) or to register with a sexual offender registry in another jurisdiction or foreign country.

42 Pa.C.S.A. § 6302 (footnote omitted).

reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made[.]" *Id.*; *see also In re. L.V.*, 127 A.3d 831, 839 (Pa. Super. 2015) (stating that, a trial court may end reasonable efforts to preserve and reunify the family at its discretion).

Here, Mother does not challenge the trial court's order adjudicating B.B. dependent pursuant to 42 Pa.C.S.A. § 6302(1) and (10)[8] or the trial court's determination of the existence of aggravated circumstances. *See* Order of

_____

[8] Section 6302 states, in pertinent part, that a child is dependent if the child

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian[,] or other custodian that places the health, safety[,] or welfare of the child at risk, including evidence of the parent's, guardian's[,] or other custodian's use of alcohol or a controlled substance that places the health, safety[,] or welfare of the child at risk;

> . . .

> (10) is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S.[A.] § 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety[,] or welfare of the child.

42 Pa.C.S.A. § 6302 (definition of "dependent child," criteria 1 and 10).

Adjudication and Disposition, 7/7/21, at 2; *see also* Mother's Brief at 8 (stating, Mother "does not contest that she [] had her parental rights to previous children terminated, which is the basis for the [trial] court's aggravated circumstances finding and dependency adjudication"). Rather, Mother asserts the trial court, upon finding the existence of aggravated circumstances, abused its discretion in failing to preserve and reunify the family because Mother "has demonstrated a willingness to cooperate with [BCCYS] and [has] shown progress in the short time she had been asked to engage with recommended services." Mother's Brief at 8. Mother summarizes her argument as follows:

> [Mother] has struggled in some areas of her life, but has already demonstrated some success at conditions leading to dependency of her child.[9] She has already been successful at addressing her substance use, which was a major roadblock to success in her previous dependency cases.[10] And while she is going to need to work at learning parenting skills, she was already progressing in the short time between the adjudication hearings.[11] She knows

_____

[9] Mother admits to previously using methamphetamine and cocaine and using oxycodone for pain related to an automobile accident in 2018, which she continued to take from the time it was prescribed until her admission to a psychiatric hospital in May 2021. Mother's Brief at 10-11. Since May 2021, Mother asserts that she has made no threats or attempts at self-harm. *Id.* at 11.

[10] Mother asserts that since May 2021, she "has taken the initiative herself to attend [a] drug counseling program[.]" Mother's Brief at 11.

[11] Mother acknowledges that "she initially needed instruction regarding basic skills such as feeding and holding the child" but that, after two months of working with a family preservation caseworker, she "was now able to prepare

what she has to do, and agreed to do whatever services are necessary.[12]

*Id.* at 11-12.

Upon finding the existence of aggravated circumstances, the trial court explained its reasoning for ordering BCCYS to forgo further efforts to preserve and reunify the family as follows:

> The [trial] court heard testimony at adjudication hearings held on June 1, 2021, and July 6, 2021. [BCCYS] entered evidence that the parents continue to demonstrate instability in the areas of parenting skills, housing[,] and failing to prioritize mental health treatment. The [trial] court heard testimony from [] a mental health therapist from the local office of the Department of Behavior Health Services[ "DBHS," who treated Mother's mental health issues. The mental health therapist] testified as to [Mother's] multiple missed appointments, despite numerous calls and reminders. This demonstrated [Mother's] lack of commitment and consistency in availing herself of the offered mental health services. Of particular concern to the [trial] court was [Mother's] suicide attempt on May 6, 2021. []
>
> The [trial] court also heard evidence from [] a family preservation caseworker with over [10] years of experience in providing reunification services to families. [The family preservation caseworker] testified at the June 1, 2021[] adjudication hearing that she had been supervising visits for the family for the past month and had strong concerns about the parents and their interactions with the child. The parents failed to prioritize visits with the child. The parents overslept and were late to a visit. Additionally, another visit was missed due to a lack of

---

a bottle appropriately without supervision[] and demonstrated improvement with handling the child." Mother's Brief at 9-10.

[12] Mother states that "she knows it means being clean from drugs and alcohol, showing her son love and affection, holding him and feeding him, and building confidence in herself each time she visits." Mother's Brief at 10 (brackets omitted).

transportation, which prompted the [family preservation] caseworker to provide transportation for subsequent visits. [The family preservation caseworker] also testified as to concerns about [Mother's] interactions with the child during the supervised visits, in that [Mother] lacked even the most basic parenting skills. [Mother] fell asleep while holding the baby, failed to support the baby's head, needed help in measuring the bottles[,] and[,] overall[, failed] to focus on the child. [The family preservation caseworker] noted that the parents have a pleasant demeanor and expressed a desire to reunite with the child.

At the July 6, 2021[] hearing, [the family preservation caseworker] provided an update as to the visits that occurred since the first hearing. [The family preservation caseworker] testified that the parents were engaged better with the child and that [Mother] demonstrated some improvement in parenting skills since the last hearing. There continues to be instability in housing and unaddressed mental health issues. She further testified that [Mother's] parenting abilities are not sufficient for return of the child.

[A] caseworker with [BCCYS] also provided testimony as to the history of the parents with regard to other children. The [trial] court notes that [Mother] had her parental rights involuntarily terminated to not one, but two children in the three [] years prior to the birth of the instant child.[13] [The BCCYS caseworker] testified that [Mother] was not compliant in her outpatient mental health treatment. [Mother] missed multiple mental health counseling appointments with DBHS[,] as well as missed sessions with her group drug counseling [program].

[Mother] testified that she can't remember to make the appointments and[,] at times, does not have a phone. In her testimony, [Mother] addressed the May 2021 suicide attempt. [Mother] testified that she was in pain and under stress and admitted that [Father] had to pull oxycontin pills out of her mouth.

_____

[13] More accurately, we note that Mother's parental rights to only one of her other children were terminated in the three years prior to B.B.'s birth, which occurred in March 2021. Specifically, Mother's parental rights were terminated as to one of her children in June 2019, nine months prior to B.B.'s birth. Mother's parental rights were terminated to her other child in February 2018, three years and one month prior to B.B.'s birth.

While the [trial] court recognize[d] that [Mother] is now employed and[,] as of the July 6, 2021[] hearing, had attended some mental health counseling appointments, the [trial] court continue[d] to harbor strong concerns as to the lack of consistency in mental health treatment, lack of stability in the area of housing[,] and the overall parenting abilities of [Mother].   While the [trial] court note[d] that [Mother] displayed some improvement in parenting skills in the month between the two hearings, the [trial] court remain[ed] gravely concerned as to the safety of the child due to [Mother's] overall inconsistency in treatment and instability in housing.   The very young age of the child [was] of particular relevance to the [trial] court.

While family preservation remains one of the primary purposes of the Juvenile Act, the child's safety and health must supersede all other considerations.   The focus of dependency proceedings is on the child.   Safety, permanency[,] and the well-being of the child must take precedence over all other considerations, including the rights of the parents.   In this case, the [trial] court focused on the safety, well-being[,] and right to permanency for this very young child, rather than Appellant's hopes of improving her situation at some vague point in the future.

Trial Court Opinion, 8/26/21, at 3-6 (extraneous capitalization, citation, quotation marks, and footnote omitted).[14]

In sum, the trial court found, and the record supports, that the discontinuation of family preservation and reunification efforts was in the best interests of the child because of: (1) Mother's instability of parenting, including

_____

[14] Both BCCYS and the guardian *ad litem* appointed to represent the best interests of B.B. filed briefs in support of the trial court's aggravated circumstances order.   In sum, both parties assert that the trial court had broad discretion in deciding to forgo family preservation and reunification efforts and that, based upon Mother's mental health issues, housing instability, and lack of an appropriate level of parenting skills, despite Mother being offered services and skills training, the trial court's decision to forgo preservation and reunification efforts was in the best interests of B.B.   *See* BCCYS's Brief at 4-11; *see also* Guardian *Ad Litem*'s Brief at 4-14.

both her limited parenting skills and failure to prioritize the child's needs, (2) Mother's instability of housing, and (3) Mother's failure to prioritize her mental health treatment. A therapist from the Bedford County DBHS testified that Mother participated in her initial in-take appointment and one subsequent appointment. N.T., 6/1/21, at 11. Mother was seeking therapy for depression, increased anxiety, problems with family, and the development of coping skills. *Id.* at 14. The therapist stated that Mother missed her third appointment and, although Mother was not discharged from the services program as of the June 1, 2021 hearing, she never rescheduled or participated in any additional therapy appointments. *Id.* at 12, 14.

A family preservation caseworker with BCCYS, who had, at the time, more than ten years of experience, stated that, as of the June 1, 2021 hearing, she had supervised and coached Mother in parenting skills during her weekly visits with B.B. for a little over one month. *Id.* at 21-22. During this one-month period, Mother missed one of her weekly visits due to lack of transportation, and BCCYS agreed to provide transportation services to Mother so she could attend her future weekly visits. *Id.* at 22. The family preservation caseworker testified that after working with Mother during three supervised visitation sessions, her concerns remained that: (1) Mother did not prioritize the needs of the child, as demonstrated by Mother being tired and falling asleep during visits, her oversleeping and being late for visits, and BCCYS having to wait for Mother to become available for her scheduled transportation to the visits; (2) Mother needed assistance with basic parenting

tasks, such as preparing a bottle; (3) Mother needed to be reminded to hold and support the infant child's head while holding him; and (4) Mother continued to exhibit mental health issues, including being unable to focus on the child during the visit. *Id.* at 23-25. When asked if further reunification efforts would be successful, the family preservation caseworker stated, "It would be difficult to say, but it definitely would take some time, really working from the ground up on learning those very, very basic parenting skills." *Id.* at 24. The family preservation caseworker stated that, in her opinion, Mother, at this point, lacked basic parenting skills. *Id.* The family preservation caseworker did acknowledge that Mother had a pleasant disposition during the visits, accepted the parenting-skills coaching that was provided to her, and expressed a desire to reunite with the child. *Id.* at 26-27.

At the July 6, 2021 hearing, the family preservation caseworker testified that Mother had participated in additional supervised weekly visits since the prior hearing. The family preservation services provider stated, that during the interval between the two hearings, Mother "has made a bottle, done so appropriately, with some supervision[,] and can make one now without supervision." N.T., 7/6/21, at 5-6. The family preservation caseworker further stated that Mother learned to burp the infant child and that they were still working on Mother gaining more confidence in handling the child and understanding how much force she can use when handling the child. *Id.* at 6. Overall, the family preservation caseworker acknowledged that Mother "has demonstrated some improvements." *Id.* When asked if Mother could

safely take care of the child at this point, the family preservation caseworker stated, "At this point in time, no, because [she does] not even have [her] own residence or a residence [where she] can permanently reside." *Id.* at 9. Ultimately, the family preservation caseworker expressed,

> I don't believe my concern is necessarily regarding [Mother's] ability to make a bottle, burp the baby, hold the baby, feed [the baby]. My concern is surrounding the outside dynamics, which would be addressing mental health [and having] a safe residence. Those are the issues that, I believe, would need **long term attention and consistency** in order to best meet the child's needs.

*Id.* at 10.

A BCCYS caseworker testified that, as of the July 6, 2021 hearing, BCCYS was unaware of where Mother was living and that, although Mother purported to be staying with a friend, BCCYS did not know who that friend was or where the residence was located. *Id.* at 13. The caseworker detailed Mother's emergency room admission in May 2021, pursuant to 50 P.S. § 7302, for concerns of suicidal ideations, which were predicated upon Father removing several oxycodone pills from Mother's mouth.[15] *Id.* at 17; *see also*

_____

[15] Section 7302 of the Pennsylvania Mental Health Procedures Act sets forth the procedures and protections surrounding the involuntary emergency examination and treatment of a person as authorized by, *inter alia*, a physician "or other authorized person who has personally observed conduct showing the need for such examination." 50 P.S. § 7302. Under Section 7302, a person may be examined to determine the need for emergency treatment if, *inter alia*, there is evidence the person attempted suicide and there is a reasonable probability of suicide unless adequate treatment is afforded the person. *Id.*; *see also* 50 P.S. § 7301(b)(2)(ii).

BCCYS Exhibit #2. The inpatient evaluation and progress form stated that Mother admitted to writing a note prior to her emergency room admission but that Mother denied the note discussed ideations of suicide or self-harm. N.T., 7/6/21, at 17; *see also* BCCYS Exhibit #2.

Upon review of the record, we discern no abuse of discretion in the trial court's order directing BCCYS to forgo future efforts to preserve the family unit and reunify B.B. with Mother. The record shows that Mother demonstrates only very basic parenting skills, having only cared for the child under supervised conditions, that instability of housing remains an issue, and that Mother's mental health issues continue with only minimal efforts to address them. Although Mother promises to continue her efforts to learn parenting skills, address her substance abuse and mental health issues, and overcome her other life struggles, the focus of the Juvenile Act is not on the rights of the parents but, instead, on a child's safety, permanence, and well-being, which must take precedence over a parent's promises to do better. *See In re R.P.*, 957 A.2d 1205, 1219 (Pa. Super. 2008); *see also C.B.*, 861 A.2d at 295 (Pa. Super. 2004) (stating, "the health and safety of the child supercede all other considerations"). Pennsylvania courts are ever-mindful that "[a] child has a right to a stable, safe, and healthy environment in which to grow, and the child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation and original quotation marks omitted).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  02/14/2022